21-2027. Thank you very much. Mr. Gort. Thank you. May it please the court. Of course, this is a social security disability case arising under the regulations before they were changed in 2017. Those regulations and these court's opinions tell the administrative law judge how to evaluate opinions that come before him. You have, for example, if let's say you're treating physician thinks that there's a problem with somebody and they send him for aqua therapy and the aqua therapist gives an opinion. That's a non-examining opinion, a non-medical opinion that's entitled to very little weight. The non-examiner for the commissioner, depending on all the circumstances, how much he has before him, this court has said sometimes that they get nothing more than ipsy dixit. The examiner then, obviously, depending on when he did it, gets a little bit more. But then we get into the opinions that get the greatest weight. You have the treating physician opinion. Of course, it depends on how much they've seen him, how long a period of time. And then at the very top, you have the specialist. So if you have a cardiologist on a heart issue, if you have an orthopedic on a back issue, if you have a gastroenterologist on a Crohn's issue, if you have a podiatrist on a feet issue, they get the greatest weight. Mr. Gort, can I ask a question? You referenced that this case preceded the 2017 regulations. How did the 2017 regulations, what's different about the analysis if it were today versus then, just in general terms? Yeah, I mean, it depends on how you look at it. But certainly they say that the treating physician is on the same plane, and even like a registered nurse is on the same plane as other opinions. What you look is at the supportability and the consistency. We've argued several times, even in this court, sugar, I'm senile, I forgot the name of the case, but it was one in which we had lax, in which the treating physician did give the greatest weight, and Colgan, I think, too, which was actually a published case. And even though the treating physician, in and of itself, is not told to get the greatest weight by the new regulations, in fact, because of supportability and consistency and the factors that go into it, we argue there's very little change. But that would be the actual written change. So the issue, go ahead. My question has to do with the fact that the ALJ specifically said that the podiatrist was not afforded weight, but then discussed it. And I'd like you to talk a bit to me about what happened. That is, can we say that the error which is admitted is harmless and it would be futile to send it back? Or is there a problem of anchoring? That is, that we don't really know what a person did. Right. And that is the point I was exactly going to get to. Because the commissioner, as always, great briefs, says that. The ALJ does say, podiatrist, saw him six years, saw him more than 40 times. The problem is that in evaluating that, you and I, commissioner, everybody here knows what a podiatrist is, but the ALJ is looking at him as the aquatherapist, not an acceptable medical source. So every time the administrative law judge talks about that opinion, whatever word he's using, he's evaluating it, oh, yeah, the aquatherapist saw the claimant 40 times over six years, but I'm not going to give it weight, because it's not an acceptable medical source. He very specifically says that. And the problem is, that then permeates his entire decision as to everybody else. Because on everybody else, you've got, for example, you've read the briefs, you've got laminectomy, discectomy, you've got all sorts of back issues, you've got everybody who opined on the issue of off-task and absenteeism, the pain doctor, Calkins, the primary doctor, Shoaib, I think, the orthopedist, and I'm forgetting all their names. Yeah, but on all the other things, isn't there enough evidence so that on our cases, we pretty well would have to give the ALJ's decision an okay? Not on those two aspects. Not if he completely misunderstands who the treating source is. He takes them from the top, okay, I'm going to look at what he says, he gets the greatest weight to the aquatherapist. And every time he uses the word podiatrist, which we all know what it means, in the ALJ's mind, he's thinking, that's an opinion from an aquatherapist. It gets no weight at all. But to Judge Calabresi's question, wouldn't that mean that if there were a remand, it should be limited to the podiatry issues in the case? Well, so two things on that, thank you. Now, we think because that impacts every other decision. You're saying that the fact that he got that wrong makes us, it's the 13th stroke of crazy clock, which isn't only wrong in itself, but casts doubt on everything else. Right. It permeates, that permeates the entire decision. And at least I'll get this in for two seconds, we do argue in the last part of our, in our brief, that we think it should be remanded for calculation of benefits only, but that's okay. But to push back, I take your point that there could well be anchoring here and that the of Dr. Hogan as being somehow a lesser species of physician may permeate the analysis. Nevertheless, on its face, the ALJ's decision does appear to, almost as an alternative, take on the conclusions of Dr. Hogan and find them to be contradicted by a host of other evidence. Is there some reason not to take that at face value? Right. I don't agree with that because he's not saying that a specialist, he's saying that a nothing. And it's also, we also disagree because even without the podiatrist, on the issue of off-task and absenteeism, every single doctor who offered an opinion on that issue says it's 33% four days and the vocational experts said even 10%, even one day. So I think it, personally, we think we should get remanded for calculation of benefits only. But if not, remanded for the whole kit and caboodle. May I ask you just one other question? Your client is a hair braider, correct? That's the job that she had had? That she had done. For all of the detailed discussion here, I was left wondering how often a hair braider is on her feet doing the job. It seems the natural question given the podiatry focus of some of the medicine. I couldn't discern from the record how much that's a standing job. Well, whether it is or not, it is certainly not a job that you can do 25% of the time with your feet up. It certainly is not a job you could do, and this is what the vocational experts said, the commissioner's vocational experts said, cannot do if you miss a day of work, cannot do if you're 10%, you know, I'm in such pain, I'm 10% off task. Or even we have the psychiatric issues, which in and of themselves might not, but when you add the three, you've got Dr., forgive me, I wrote it down, you've got Dr. Moore, you've got, these are their consultants, Moore, Sloack, and Jurega, all saying that there's diminishment to ability to work consistently, and then we've got Webster and Webb, so you've got seven all together saying that that at least contributes. So it's not a matter even of whether the feet alone would be 10% or one day. Feet, 5%, half a day. Back, 5%, half a day. Psych, something. So I think it has to be sent back for everything. But again, we are, you know, thank you. Thank you. Thank you. We'll hear from you again on rebuttal. Ms. Carter. Good morning, Your Honor. May it please the Court. My name is Molly Carter and I represent the appellee. Please speak right into the microphone and clearly. Thank you. Thank you, Your Honor. This Court should affirm the Commissioner's decision that Ms. Claudia required to return to her past relevant work. The record in this case contains 20 different opinions on Ms. Claudia Montano's functioning. As explained in our brief, there are many that support the ALJ's conclusions. Of course, there are also those that support Ms. Claudia Montano's claims. Can I ask about that? So we were just talking about this off-task absenteeism sort of issue. Yes, Your Honor. And I see Dr. Calkins, Dr. Shoab, Dr. Siebel, see a whole bunch of opinions as to the diminution in her concentration, work pace, off-task behavior, need for breaks. I don't see the ALJ citing any contra-medical authority on that. I see the ALJ making a judgment based on the ALJ's assessment of the evidence that all of those medical opinions are wrong. Am I misunderstanding the ALJ's reasoning? Your Honor, I would say you're mischaracterizing the ALJ's reasoning. The ALJ was doing exactly what she was supposed to do as directed by the regulations and this Court, which was But she certainly, the ALJ certainly focuses an awful lot on whether she could do housework and whether she could go to a doctor. And we have case after case that says that while that is relevant and something that can't be the focus of the ALJ's attention. And my concern is that perhaps guided by this admitted error, the ALJ then goes and looks at things which aren't really that significant. That is, medically, that they are her opinions. Your Honor, I would concede, of course, that the ALJ does discuss, as she's required to do when assessing the RFC, the activities of daily living. However, the ALJ focused also on specific inconsistencies between the opinions and the evidence. For example, each of the medical sources that Ms. Claudia Montanez cites as to time off task resulting from her physical opinions says that her conditions and or medication side effects would cause that time off task. And they all cited either fatigue or drowsiness. The problem is in the record, Ms. Claudia Montanez repeatedly denies fatigue. She denies medication side effects altogether. And so there is specific inconsistencies in the medical record that the ALJ cited and noted as reasons for discounting those opinions. Moreover, the ALJ also did cite additional related medical evidence, observations that she was not fatigued, she was not tired, she was alert, that also goes to those inconsistencies. How do we untangle those? You've cited some factors that I would agree with you are within the scope of the kinds of findings an ALJ can make. There are also findings about, gosh, you care for your mother and that's inconsistent with these findings. Well, she testified she cares for her mother 18 hours a week. She testified that she takes breaks very frequently. In what way is that inconsistent and is that the ALJ speculating as to what tasks are involved in caring for her mother? Same with school, et cetera, et cetera. Just a general question, I guess. Two points, Your Honor. At least some of the time the ALJ was citing caring for her mother and attending for school, there were, again, very specific inconsistencies. For example, Dr. Hogan's opinions were that she couldn't stand more by the end of the period, more than five minutes per hour, and that she had to elevate her legs a certain amount of time, whereas she says, I'm sitting at this computer for hours a day going to school. I'm caring for my mother 18 hours a week, which includes shopping, cleaning, attending to her physical needs, which, again, is substantial evidence that is simply inconsistent with the notion that she can only stand five minutes per hour. But as to Dr. Hogan, if you start with the premise that the ALJ for some reason regarded Dr. Hogan, as some lesser form of medical scholar, why should we assume the analysis would come out the same if the correct premise preceded the analysis, which is this is a qualified source? Two things, Your Honor. One, the entire analysis of the substance of the opinion, the fact that it was not supported by medical evidence and it was not consistent with the other evidence, which is the actual standard for whether an opinion gets controlling weight, preceded the misstatement. The ALJ substantively discussed the podiatrist's opinion extensively before at the end. It may have preceded in the discussion, but it surely was in the ALJ's mind what he said after that this wasn't a doctor. That is, I don't think you can untangle, I mean, I may say something first and something after, but what's in my mind is still the same. And my problem is that even though absent this mistake, it might be a close case, but we would say there's enough for the ALJ. How can we untangle all this from the fact that the ALJ in his mind had something which was wrong? Your Honor, I would push back against the appellant's notion that the ALJ equated, by simply saying that this wasn't an acceptable medical source, equated this with an aqua therapist. The ALJ correctly and repeatedly noted that this was a podiatrist. And the fact that she said that this was not an acceptable medical source is actually a very narrow definition under, again, the old regulations which are applicable. The new ones do expand the definition of an aqua therapist. Under the old regulations, plenty of specialists are not acceptable medical sources. Many of the mental health practitioners that individuals see and who are specialists, licensed social workers, nurse practitioners, registered nurse practitioners that often give therapy and can even prescribe medication, those weren't acceptable medical sources under the old regulations. So to say that simply because the ALJ said... If there were specialists who under the applicable regulations were not acceptable medical sources and the ALJ has that in his mind, then why doesn't the fact that he puts the podiatrist in the same category make things worse? Because she still did the correct analysis. She still explained that it wasn't consistent with the objective medical evidence and it wasn't supported by objective medical evidence and it wasn't consistent with the evidence. She did the analysis that she was required to do no matter what. If we sent it back, we know that the analysis would still be the evidence didn't... The opinion itself isn't going to change. It's still inconsistent with the evidence. It's still unsupported by the objective evidence. The ALJ has made his mind up sufficiently that the opinion isn't going to be changed. And that might suggest something we very rarely do. Your Honor, I meant that Dr. Hogan's opinion is not going to change. The ALJ will have to weigh that same opinion which she has... I did not mean that the ALJ's decision wouldn't change. I want to clarify that. But the ALJ has looked at the content of this opinion and found that it is not supported by the objective medical evidence. So let me ask you. So I take your point that we need to look at the substance of what the ALJ said about Dr. Hogan. And if there's enough basis in there for giving his opinion a little weight, then that would be the analysis that we would see on remand as well. But one of the things I'm struggling with a little bit... You said that the ALJ found that his opinion wasn't consistent with the objective medical evidence. So let me take an example. Dr. Hogan says you need to elevate your leg. There's some variation over time, but there's elevation that needs to happen. Elevate your feet. The ALJ says, well, I don't see any evidence in the record of redness, swelling, infusion, or other things. Now, one of the things I'm struggling with is if a doctor had testified, or any medical professional had testified, that the only factors that would counsel for elevating one's feet are swelling, redness, and infusion, then I think that the ALJ would be under solid ground and relying on that as a factor. But as far as I can tell, the ALJ has decided in her own probably experience seeing a lot of these cases that the only plausible basis for the recommendation to elevate would be a basis that would be reflected in the symptoms of swelling, redness, and infusion. And I don't see any support for that in the record. I have two points, Your Honor, and I see my time is about to expire. May I answer? Please respond. Thank you. First, the question, as this Court explained, for example, in McIntyre, is if the ALJ made a reasonable inference, the Court must affirm even if other reasonable inferences could also be supported. So while there may not be additional testimony that is also consistent with the ALJ's inference, the ALJ made a reasonable inference that the fact that there was no evidence of swelling in one's legs... You see, the problem here is there was an original mistake. And so what might just be an inference and we could choose one or another is not the same in a case where the presiding judge asked you what is there that leads us to say that we can say definitely that the original mistake didn't influence. And you just say when there wasn't an original mistake, we take what the person said. But that is in this situation. Well, that's correct, Your Honor. The facts are not exactly the same. My other point would be that, one, there are a number of other physicians, all cited in the record, whose opinions do support the RFC as assessed and were not consistent with Dr. Hogan's... No, that I get. Moreover... May I finish? Yeah, absolutely. My other response to your original question, Judge Robinson, was that the other thing that the ALJ said about Dr. Hogan's opinion was not just evidence of swelling, but ample evidence of normal gait, again, to counter the portion about walking, which is... A lay person can see the tension between the evidence that she was walking way more than Dr. Hogan ever opined that she could. So that is also a support for her analysis of his opinion. No, no. I want to apologize for jumping on you. Did you get to finish the point you wanted to make? I did. I can take other questions if my time has expired. I do want to follow up, though. On the notion that it's a reasonable inference, and this is a broader issue I have throughout this analysis, I'm trying to understand where the ALJ's ability to sort of make what are essentially medical judgments ends and where the line is between overstepping. So how is it a reasonable inference for a lay person to conclude that if there's a recommendation for elevation, it must be related to swelling, rather than, let's say, a neurogenic issue that is designed to relieve pressure. Where is the reasonableness of that supported? So again, more broadly, Your Honor, I would note that this court addressed sort of the notion of a lay person making these judgments most recently in the Shillow case, making clear that the ALJ is not required to base her findings of the RFC on a medical opinion. The ALJ is required to consider the evidence as a whole and assess the RFC. So this is most broadly exactly what the ALJ is tasked with doing. And especially when weighing medical opinions, the regulations, again, specifically require her to consider the degree to which there is support and the degree to which they're consistent. Dr. Hogan didn't say in his opinion whether there was swelling or not. He didn't really explain his opinion that well. So the ALJ was left with doing what the regulations require, which is simply comparing it to the record, especially the notes from the podiatrist, Dr. Hogan, to see what was there. So the ALJ was, in weighing the opinion, using the evidence that she had, weighing it in the context of the opinion. In the broader context of assessing the RFC, again, having discounted Dr. Hogan's opinion, she also had four other opinions to substantially support the finding that the claim could work at this level. So again, it's under a substantial evidence standard that we weigh the factual finding of the RFC as well as the other analyses. Can I just follow up, though, as to Dr. Hogan? Certainly. You've been speaking at length about the substantial whether or not Dr. Hogan had used medically acceptable clinical and laboratory diagnostic techniques. Looks to me as if the ALJ, having mischaracterized what Dr. Hogan was, never really engaged with that step. Am I misreading the ALJ's decision? Well, it's both, Your Honor. It has to be both supported by the medical evidence and not inconsistent with the other evidence. So the ALJ did both of those and found that it didn't meet either. Appreciate it. Any further questions? Thank you, Your Honor. We ask that you affirm. Thank you. Mr. Gordon. Thank you. I want to start by 100 percent agreeing with what the Commissioner said about what happens when it comes back, and it's mostly due to the administrative law judges are awesome, beyond awesome. Judge Kennecke, who had this, is going to do exactly what the Commissioner's representative has said. It's going to make the exact same decision, word for word, and only change the fact that the podiatrist is an acceptable medical source. We ask the Court to remand for calculation of benefits, but if not, we ask the Court to at least consider asking the Commissioner to, or requiring the Commissioner to send it to a different administrative law judge, given everything in this case. So I agree with that. Doesn't the length of the time this case has been going sort of counsel in favor of not having somebody else start from scratch? I don't think that makes any difference, because the administrative law judge would actually have to review it, and very likely if it's sent to another administrative law judge, they're going to do what should have been done, is get a medical expert. It's not fair. You're not suggesting the ALJ was biased. There's an error made, presumably based on which, the time of the regulations and what applies. But there's no, on its face it's a detailed, thoughtful exposition. Absolutely, no. I'm just agreeing with what the Commissioner has said to this Court. But the problem is, if it isn't biased, and you say this is all that way, it sounds as if sending it back is futile, and where it is futility, we are allowed under Chenery to decide ourselves, rather than sending it back. So I'm afraid that your argument is in some ways cutting against you. I do that a lot, Judge. Well, you know, we had asked that it be sent back just for recalculation of benefits. It was just a suggestion. The only other thing I want to mention, because I have very little time left, but the only other thing I want to mention is that when the doctors talked about the off-task and absenteeism, there was a specific question asked of them. What is the effect of pain? And, you know, I'm in so much pain, I'm not thinking about what I'm doing. And they say it is, and I didn't go through the pain, oh, my goodness, in both of our briefs, a million examples of the pain. That is what, or at least contributes to the off-task and absenteeism. That plus the fact that, as they say, these type of conditions wax and wane. So sometimes you're absent. Thank you, Your Honor. Thank you. Thank you. That concludes our calendar for today. So we stand adjourned. We'll take it under advisement. Thank you, counsel, both for your thoughtful arguments.